THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.*
PRENSA INSULAR DE PUERTO RICO AND ANTONIO AYUSO
VALDIVIESO, Defendants and Appellants.

No. 13238.   Argued December 1, 1948.—Decided March 18, 1949.

*Juan B. Soto, Félix Ochoteco, Jr., Guillermo Cintrón Ayuso, Luis E. Dubón,* and *Juan F. Soto,* for appellants. *Vicente Géigel Polanco, Attorney General (Luis Negrón Fernández,* former *Attorney General,* on the brief), *José C. Aponte, Special Assistant Attorney General,* and *J. Rivera Barreras,. Prosecuting Attorney,* for appellee.

MR. JUSTICE MARRERO delivered the opinion of the Court.

The District Attorney of San Juan filed, in the Munici-- pal Court of San Juan, several informations against Prensa.

Insular de Puerto Rico, Inc., and Antonio Ayuso Valdivieso, for the offense of libel. After the corresponding trials were held in said court and *de novo* in the District Court of San Juan, two of those informations are now under our consideration. Both cases were submitted on the same evidence introduced in the lower court, and in each of them Prensa Insular de Puerto Rico was sentenced to pay a fine of $300 and Antonio Ayuso Valdivieso a fine of $200 and in default of such payment, the latter to be confined in jail one day for each dollar left unpaid, such imprisonment not to exceed ninety days, plus costs. The informations involved in the appeals taken by both defendants recite, in substance, as follows:

"The said defendants, Corporación Prensa Insular de Puerto Rico, Inc., which is a corporation organized under the laws of Puerto Rico . . . as owner and editor of the newspaper 'El Imparcial' published daily in the City of San Juan, Puerto Rico, and Antonio Ayuso Valdivieso as editor of the said newspaper, did unlawfully, wilfully, and maliciously in San Juan, Puerto Rico, within the municipal judicial district of the same name, permit to be published and did actually publish and cause to be circulated in the said city of San Juan and throughout the Island of Puerto Rico in the said newspaper 'El Imparcial', on or about January 31, 1947, in the edition of year XIV, vol. 25, No. 5654, an article entitled 'Condemnation or Corruption?— The People Will Say' which article reads as follows:

(1) " 'Deriding law and insulting justice, availing of the subterfuge, lately in vogue, of a condemnation proceeding, the Commissioner of Education, Mariano Villaronga, has just consummated an illegal business transaction with the Caguas Development Company, the most important partner of which is the Commissioner of the Interior, Orlando R. Méndez, whereby The People of Puerto Rico paid the sum of $32,020 for two plots covering an area of one and one-half acres (*cuerdas*), to be divided in lots to be used to build thereon several school buildings at the place known as "El Verde" in Caguas. (2) In spite of the fact that Sections 202, 203, and 205 of the Political Code of Puerto Rico prohibit public officers from being interested in business affairs

carried on with the Government, the Commissioner of Public Education, Mariano Villaronga, availing himself of the office of the Attorney General, on the 15th instant instituted condemnation proceeding against Caguas Development Company, one of whose partners is the present Commissioner of the Interior, Orlando R. Méndez, for the acquisition of two plots, located in Caguas, at the place known as "El Verde", the first having an area of 1.407 acres, and the second, .523 acre, or a total area of one and a half acres, more or less. (3) These plots are outlined in the plans made therefor by the Department of the Interior of Puerto Rico on October 24, 1946, and December 28, 1946. The petition for condemnation referred to above, which was filed in the District Court of Caguas, is signed by Luis Negrón Fernández, who is Acting Attorney General, and by F. J. Pérez Almiroty and F. Navarro Mendía, officers of the Department of Justice. (sic) (4) Following the condemnation' proceedings now in vogue, Mariano Villaronga, acting in the name and representation of The People of Puerto Rico, and in his capacity as Commissioner of Public Education, fixed the price of $32,020 as a just and reasonable sum to be paid by the Government of Puerto Rico for the acquisition of both plots. (5) Neither Slow nor Idle. Although Commissioner Villaronga alleged in the petition that all friendly efforts that had been made to acquire the aforesaid plots by purchase at the indicated price of $32,020 had failed because Caguas Development Company had refused to sell them at that price, the truth is that the members of said firm, as soon as the latter was served with notice of the petition filed against it to condemn the two plots aforesaid, neither slow nor idle, consented thereto on the day following the service of notice and agreed to accept Commissioner Villaronga's generous offer. (6) Unto Whomsoever God hath Granted . . . If time elapsed rapidly between the filing of the petition and the consent thereto by the partners of Caguas Development Company, with no less haste did Justice proceed, for on January 17, that is, the day after the petition was filed, the District Court of Caguas, by its Judge, Mr. José Villares Rodríguez, did enter the following judgment: (7) "JUDGMENT. The People of Puerto Rico represented by the Commissioner of Education, Mariano Villaronga, has instituted a condemnation proceeding against

Caguas Development Company, a partnership created under the laws of Puerto Rico, by Deed No. 128, executed before Notary Luis Morales Contreras, in Caguas, Puerto Rico, on July 7, 1945, and with offices at the city of Caguas. The property involved in this action consists· of two parcels of rural land located in the ward of Turabo, Caguas, in the Subdivision 'El Verde', the first having an area of 1.407 acres and the second, .523 acre, which are described as follows: 'A' and 'B' (as they appear in the petition).—These parcels are segregations from a larger tract, which is described as follows: 'Rural: Parcel of land, etc. (Petition).' —The interest which The People of Puerto Rico intends to acquire in the aforesaid property is a title of absolute ownership to carry into effect the enlargement of the High School and Junior High School of Caguas, Puerto Rico, as well as to build a new school building, all of which constitutes a public necessity,. pursuant to the provisions of Section 2 of Act No. 256, of April 3, 1946. The People of Puerto Rico deposited in the Office of the Clerk of this Court the sum of $32,020, that is $23,800 for plot 'A' and $8,200 for plot 'B'. The respondent, Caguas Development Company, appeared in the proceedings and consented to the petition through its partner, Luis Sugrañes Izquierdo.—Therefore, judgment is entered declaring that The People of Puerto Rico has been invested with the full dominion title to the above-described parcels, together with all the buildings, betterments, uses, easements and accessories thereof, including any right, title or interest that respondent may have in them, to be used for said public purpose. It is further ordered that respondent and its representatives, agents or employees in possession of said property, transfer and deliver the same to the Commissioner of Education; the sum deposited in this Court as compensation for the acquisition of the parcels is held to be just and reasonable; and the Registrar of Property of Caguas, Puerto Rico, is hereby ordered to record the dominion title to said property in the name of The People of Puerto Rico, free from all liens, encumbrances, mentions, reservations, or defects whatsoever.—Caguas, P. R., January 17, 1947. (Sgd.) J. Villares Rodríguez, Judge." (8) The Planning Board, presided by Rafael Picó, and which is located in the neighborhood of the Department of the Interior, which for a long time had

known that this illegal transaction was being effected, also allowed the consummation of this transaction, because this Board, with extraordinary haste and speed which amaze those who know its tiresome red tape, on December 4 passed a resolution approving the transaction. (9) Original Cost. —According to the Registry of Property, the main estate from which were segregated the two parcels acquired by The People consisted of 94 acres which Luis Sugrañes Izquierdo, married to Joaquina Costa Coll; Orlando R. Méndez, married to Delsie Mayoral Acosta; and María Mercedes Costa Coll purchased by public deed, on July 7, 1945, for the price of $102,000; that is, at the rate of $1,035 per acre, which estate was conveyed to Caguas Development Company by the aforesaid purchasers. Now it turns out that two parcels of the same estate, measuring in all about one and a half acres, have been acquired by the so-called "government of the poor for the poor" from the Commissioner of the Interior, Orlando R. Méndez, one of the partners of Caguas Development Company, for the comparatively astronomic sum of $32,020, almost thirty times higher than its value on July 7, 1945!—The Caguas Development Company is a civil partnership created by public deed, executed at Caguas, on July 7, 1945, before Notary Luis Morales Contreras, its partners being Luis Sugrañes Izquierdo, Joaquín Costa Coll, Orlando R. Méndez, (present Commissioner of the Interior), María Mercedes Coll Costa, and José Pomar Valls. (10) Inexplicable Consent.—The persons who know the details of this transaction can not understand how Villaronga could plead in the petition that the friendly efforts to acquire the condemned parcels had failed due to the refusal of Caguas Development Company to sell for the sum of $32,020, when the day after service of notice of the petition, the aforesaid partners consented and agreed to the sale for said price. (11) Nor has anybody been able to explain how the Attorney General could intervene in this matter without knowing that the Commissioner of the Interior, Orlando R. Méndez, was co-owner of "El Verde", when the very petition for condemnation shows on its face the constitution of the partnership Caguas Development Company, of which the Commissioner of the Interior is a partner. Something to wonder! (12) And if the Attorney General's behavior is strange, much more so

is the behaviour and attitude of the Auditor of Puerto Rico, Rafael de J. Cordero, who, without any objection, ordered the payment of such a large sum of money, without inquiring into a transaction of such a nature as the one now uncovered. (13) The Law says.—Section 202 of the Political Code: "No member of the Legislative Assembly nor any Insular, city or village officer shall be interested directly or indirectly in any contract made by him in his official capacity, or by any body or board of which he is a member, and in all such contracts there shall be an express condition that no member of the Legislative Assembly nor any Insular, city or village officer shall be admitted to any part or share of such contract."—Section 203 of the Political Code: "Insular, city or village officers shall not be purchasers at any sale, nor vendors at any purchase made by them in their official capacity."—Section 204 of the Political Code: "Every contract made in violation of any of the provisions of the two preceding sections may be avoided at the instance of any party except the officer interested therein."—Section 205 of the Political Code: "The officers of the Insular Government, and the several city and village officers, their deputies and clerks are prohibited from purchasing or selling, or in any manner receiving for their own use or benefit, or for the use or benefit of any person or persons whatever, any Insular, city or village warrants, scrip, orders, demands, claims or other evidences of indebtedness against Porto Rico, or any city or village thereof, except evidences of indebtedness issued to or held by them for services rendered as such official, deputy, clerk, and evidences of the fundamental indebtedness of Porto Rico, or of any city or village thereof."—Section 86 of the Penal Code of Puerto Rico: "Every officer who against the laws shall become interested in contracts, or becomes a vendor or purchaser at sales, or shall purchase scrip, or other evidences of indebtedness is punishable by a fine of not more than one thousand dollars, or by imprisonment in the penitentiary not more than five years, and is forever disqualified from holding any office." '

"The statements contained in the foregoing article being published with the deliberate intent of defaming Mariano Villaronga, in his said capacity of Commissioner of Education of Puerto Rico, who as such has his offices at San Juan, Puerto

Rico, within which the above-mentioned publication containing the article referred to was caused to be published and circulated by said defendants, and to impeach his honesty, integrity, exposing him to the public hatred, contempt, and ridicule and to discredit, depreciate, and dishonor him in his good reputation and frame, charging him, among others, with illegal acts, contrary to the public morals and prejudicial to the interests of the People of Puerto Rico, as is shown by the following paragraphs of the aforesaid article."

There are repeated herein the paragraphs which, for our convenience, we have marked above with numbers 1, 2, 6, 7, 8, 9, 10, and 12 (in part) and the first information ends thus:

"The foregoing paragraphs were published with the deliberate intent and calculated purpose of making Mariano Villaronga, Commissioner of Education, appear before the public opinion of Puerto Rico as having participated jointly with Orlando R. Méndez, Commissioner of the Interior of Puerto Rico, Rafael de J. Cordero, Auditor of Puerto Rico, Rafael Picó, President of the Planning, Urbanizing and Zoning Board of Puerto Rico, Luis Negrón Fernández, Acting Attorney General of Puerto Rico, and José Villares Rodríguez, Judge of the District Court of Caguas, Puerto Rico, each and all of them in their respective official capacity as such officers, and as having entered into a conspiracy in relation with a transaction for the acquisition by the People of Puerto Rico of two parcels of land situated within the Municipality of Caguas, Puerto Rico, and at that time owned by Caguas Development Company for a price greatly in excess of the true value of said land, in contravention of the laws of Puerto Rico and to defraud the People of Puerto Rico of a considerable sum of money.

"The edition of the newspaper 'El Imparcial' of January 31, 1947, year XIV, volume 25, No. 5654, containing the article 'Condemnation or Corruption?' 'The People Will Say', is accompanied and marked as 'Exhibit 1'; the edition of 'El Imparcial' of February 3, 1947, year XIV, volume 25, No. 5657, containing an article entitled:—'To a Characterization, a Challenge', and on the front page, in red letters, the phrase: 'If it is not true, why, why do they not prosecute us?'"—What I denounce as an act contrary to the law, the peace and dignity of the People of Puerto Rico."

The second information contains an introductory paragraph similar to that we have copied above and alleges that "the said defendants . . . permitted to be published and did actually publish and cause to be circulated in the city of San Juan and throughout the Island of Puerto Rico in the above-mentioned newspaper 'El Imparcial', on or about February 1, 1947, in the edition of year XIV, volume 25, No. 5655, an article entitled 'Editorial Notes—Condemnation proceeding between Pals', which article reads as follows:

" 'We are on the eve of a new legislative session. Either we are much mistaken, or in the next session a statute will be passed to avoid that any section of the Political Code of Puerto Rico—and in consequence any section of any law—might be construed by any judge in such a way as to injure the private interests of any public officer comfortably situated in the present Government set-up. (1) Why do we anticipate this possibility? For the simple reason that the Political Code of Puerto Rico in its Sections 202, 203, 204, and 205, expressly prohibits every public officer from being a party to any contract of sale in his official capacity; and also for the other reason—not so simple—that at this present time several officers serving in key posts in the Insular Government have been found in close compact in the discussion and agreement of a transaction, appallingly harmful to the public interests and at the same time grossly contrary to the above-mentioned provisions of the Political Code. (2) And let no one say that, in foretelling this possibility of the forthcoming legislative session, we are giving wings to fantasy. For the leaders of the present Government of Puerto Rico, there is nothing eerie in its stony course of abuses and grievances on the people. And if those men have passed laws to prohibit strikes against the Government, and to prohibit suits against the Government, would it be strange, to their clouded conscience of public officers, that they should decide to pass a law prohibiting also judicial interpretations adverse to them, even though statutes essential to public morals were the subject of such interpretation? (3) We have characterized as appalling the business transaction which we are discussing. The mere reading of the official and verified data published in yesterday's edition is enough to justify that characterization. Let the reader decide if it is not appalling that for

one and a half acres of an estate, for which its purchaser paid a little over two years ago at the rate of one thousand and odd dollars per acre, the Government should pay over thirty-two thousand dollars, that is, at the rate of over twenty-one thousand dollars per acre. Let the reader decide if it is not appalling that the money thus paid should go to a partnership of which a member of the Cabinet forms part. Let the reader decide if it is not appalling that another member of the Cabinet, acting by himself, should fix for that sale the enormously exaggerated price . . . Let the reader decide if all the other details of a transaction having all the characteristics of a conspiracy to defraud the interests of the people are not appalling! —This assertion is easily proven. The unconfirmed Commissioner of Education, Mariano Villaronga, determines the monstruous purchase price, for one and a half acres of the estate "El Verde", of Caguas. The Commissioner of the Interior, Orlando Méndez, is a member of the business firm which receives the money. The Judge of ·the District Court of Caguas, José Villares, approves the transaction in a proceeding ridiculously called "condemnation proceeding". The Acting Attorney General signs the petition. The Auditor of Puerto Rico, Rafael de J. Cordero, rushes to order the payment. And the President of the Planning Board, Rafael Picó, hastens to offer his "good services" so that the transaction may be consummated as soon as possible. . . —The most tragically funny thing in all this matter is Commissioner Villaronga's statement that in his "efforts" (?) to effect the said purchase "all friendly representations" had failed . . . Then, how does the Commissioner explain that the respondent firm did hasten to consent without applying to the courts in order to maintain its supposed rights and to show how the "friendly representations had failed?" What friends you have, Benito!, the people may say, knowing that it did not occur to Commissioner Villaronga, when fixing the monstruous purchase price, to seek, in a government of experts, the advice of an authority on the matter. (4) Another extraordinary detail is the haste of the Planning Board in this affair. We all know the amazing slowness of that body in its processes. Yet a transaction which was filed on January 17, 1947 is "approved" by the Board on the 4th of the previous December. . . —And what about Auditor Cordero ordering paying in haste and hurry? The officer who has wanted to show his efforts to scrutinize the course of the people's moneys

got up that day in such good temper, so good!, that he decided that a transaction involving the interests of his colleague at the Interior Department did not need to be scrutinized. . . (5) This is the story of the one and a half acres of "El Verde." May not the reader, by an association of ideas, let it dance in his mind with that other sad story of the man in the green coat. . . . .'

"The statements contained in the foregoing article being published with the deliberate intent of defaming the Commissioner of Education, Mr. Mariano Villaronga, in his said capacity of Commissioner of Public Education of Puerto Rico, who as such has his office at this city of San Juan, Puerto Rico, within which the above-mentioned newspaper 'El Imparcial', containing the article referred to was caused to be published and circulated by the said defendants, such statements tending to impeach his honesty and integrity, virtue and good reputation, and to expose him to the public hatred, contempt and ridicule, and to discredit, depreciate and dishonor him in his good reputation and fame, charging him also, among others, with illegal acts, jointly with the Auditor of Puerto Rico, Mr. Rafael de J. Cordero, the Commissioner of Interior, Mr. Orlando R. Méndez, the President of the Planning Board, Mr. Rafael Picó, the Hon. Luis Negrón Fernández, Acting Attorney General, and Hon. José Villares Rodríguez, District Judge of Caguas, such as the violation of § 62 of the Penal Code of Puerto Rico, for conspiracy, as is shown by the following paragraph of the above-mentioned article:"

There are copied herein the paragraphs which, for our own convenience, we have marked with Nos. 1, 3, and 5, and the information ends thus:

"The foregoing paragraphs were published with the deliberate intent and with the calculated purpose of making Mariano Villaronga, Commissioner of Education, appear before the public opinion of Puerto Rico as having participated, jointly with Messrs. Orlando R. Méndez, Commissioner of the Interior of Puerto Rico, Rafael de J. Cordero, Auditor of Puerto Rico, Rafael Picó, President of the Planning, Urbanizing, and Zoning Board of Puerto Rico, Luis Negrón Fernández, Acting Attorney General of Puerto Rico, and José Villares Rodríguez, Judge of the District Court for the Judicial District of Caguas, Puerto

Rico, each and all of them in their respective official capacity as such officers, and as having entered into a conspiracy in relation with a transaction for the acquisition by the People of Puerto Rico of two parcels of land situated within the Municipality of Caguas, Puerto Rico, and at that time owned by the Caguas Development Co., at a price greatly in excess of the true value of said land, in contravention of the laws of Puerto Rico and to defraud the People of Puerto Rico of a considerable sum of money.—The edition of the newspaper 'El Imparcial' of February 1, 1947, year XIV, volume 25, No. 5655, containing the article 'Editorial Notes—Condemnation between Pals' is accompanied and marked Exhibit 1, and the cartoon which appears at page 19 of that same publication and on that same date entitled 'El Verde Team', is attached and marked Exhibit 2, the edition of the newspaper 'El Imparcial' of February 3, 1947, year XIV, volume 25, No. 5657, where there appears an article entitled 'To a Characterization, a Challenge', and on the front page in red letters the phrase 'If it is not true, why, why do not they prosecute us?'—What I denounce as an act contrary to the law, peace, and dignity of the People of Puerto Rico."

The defendants first contend that the district court committed manifest error in not holding that the acts charged do not constitute a public offense. Section 243 of the Penal Code provides that "A libel is a malicious defamation, expressed either by writing, printing, or by signs or pictures, or the like, tending to blacken the memory of one who is dead, or to impeach the honesty, integrity, virtue, or reputation, or publish the natural or alleged defects of one who is alive, and thereby to expose him to public hatred, contempt or ridicule." Section 248 also provides that "Each author, editor and proprietor of any book, newspaper, or serial publication, is chargeable with the publication of any words contained in any part of such book or number of such newspaper or serial." In the informations there are textually copied two articles published in the newspaper 'El Imparcial' of which Prensa Insular of Puerto Rico, Inc., is

owner, and Antonio Ayuso Valdivieso, editor. In those articles, Mariano Villaronga is charged, in his capacity as Commissioner of Education of Puerto Rico, with having conspired with other officers of the government for the purpose of defrauding the People of Puerto Rico. A scheme of this sort constitutes the offense of conspiracy pursuant to the provisions of § 62 of the Penal Code.[1] Cf. *Mulero* v. *Martínez*, 58 P.R.R. 322, 327. When the commission of an act which constitutes a crime is charged, the libel is actionable *per se*.[2] The informations also charge Villaronga with having knowingly contributed to the violation of the provisions of §§ 202 and 203 of the Political Code,[3] as well as the provisions of §86 of ·the Penal Code.[4] In the latter case he would also be guilty of that offense as co-author thereof. The articles published are also couched in such terms that they tend to impeach the honesty, integrity, virtue, and good reputation of Villaronga and to expose him to the public hatred, contempt, and ridicule. Publications couched in such language constitute libel. *People* v. *Sierra*, 48 P.R.R. 254. In addition, the cartoon mentioned in the second information and which is entitled " 'El Verde' Team", represents eight football players grouped together, in such a position as if they were apparently deciding on their next play, all of them

---

[1] Section 62 of the Penal Code provides in its pertinent part as follows: "If two or more persons conspire: . . . (4) To cheat and defraud any person of any property by any means which are in themselves criminal, or to obtain money or property by false pretenses . . . they are punishable by imprisonment in jail not exceeding one year or by fine not exceeding one thousand dollars, or both."

[2] For a study of what constitutes libel *per se* in California and in other States, see 17 Southern California Law Review, p. 347.

[3] The Sections of the Political Code above mentioned appear in the first information in the language they contained before they were amended by Act No. 124 of August 8, 1913, p. 41.

[4] Section 86 of the Penal Code provides as follows: "Every officer who against the laws shall become interested in contracts, or becomes a vendor or purchaser at sales, or shall purchase scrip, or other evidences of indebtedness is punishable by a fine of not more than one thousand dollars, or by imprisonment in the penitentiary not more than five years, and is forever disqualified from holding any office."

with their backs turned to a football with the inscription "public interest". A caricature like that, considered jointly with the two articles published, is also libelous. See § 253 of the Penal Code and *People* v. *Pacheco Padró*, 58 P.R.R. 739. Admitting the truth of what is alleged in the informations, as it is imperative to do when an error of this sort is assigned, we reach the conclusion that the informations charge the offense of libel and that the first error was not committed.

The defendants next contend that the lower court erred in not holding that the articles "Condemnation or Corruption? The People Will Say!" and "Condemnation Between Pals", and the cartoon " 'El Verde' Team", were privileged communications since they refer to a matter of public interest; in not holding that in accordance with the evidence the said articles constituted an impartial and exact publication of the acts of official character carried out by public officers; in not holding that the publication of said articles is not presumed to be malicious; in not holding that since said articles refer to acts performed by public officers in the discharge of their duties, no comment in connection with the facts stated therein, which expresses the personal opinion of the defendants, carries with it legal responsibility, no matter how severe and harsh is the language used in such commentaries; and in holding that the only thing that the district attorney had to prove was that the articles were published.

Section 251 of the Penal Code provides that "A communication made to a person interested, in the communication, by one who was also interested or who stood in such relation to the former as to afford a reasonable ground for supposing his motive innocent, is not presumed to be malicious, and is a privileged communication." This Section, however, is not applicable to the situation now before us, because as we held in *People* v. *Gotay*, 43 P.R.R. 440, 442 "in this case the

communication was made to the public in general." We have already stated that the articles published in the newspaper "El Imparcial" involved in the informations, charged Villaronga with the commission of the offense of conspiracy .and that they also contain injurious phrases against him. A defamatory communication whereby another person is charged with a criminal offense is not privileged. The law presumes malice in such communications. The publications referred to in the informations were defamatory *per se. People* v. *Gotay, supra,* and *People* v. *Pacheco Padró, supra.* Where imputations libelous *per se* are involved, the district attorney is not bound to prove malice, as the latter is presumed from the mere fact of publication, and once such publication is proved the defendant may overcome the presumption of malice by introducing evidence tending to establish the truth of the facts charged and the justifiable motive for the publication. *People* v. *Girona,* 59 P.R.R. 294. As may be easily seen by § 246 of the Penal Code,[5] the only defense of an accused in these cases is the truth of the alleged libelous matter and that it was published with good motives and for justifiable ends, or that in accordance with § 251 of that same Code it might be considered as a privileged communication. The reference made in § 246 to the effect that the communication should have been published with good motives and for justifiable ends is subjected to the fact that such communication be true. The errors assigned under Nos. II, III, V and VIII are thus decided.

In the seventh assignment the defendants contend that the trial court erred in admitting in evidence, over their objection, the articles which appeared in the above-mentioned issues of the newspaper "El Imparcial", and also the cartoon

---

[5] Section 246 of the Penal Code.—"In all criminal prosecutions for libel, the truth may be given in evidence to the court or jury, and if it appears to the court or jury that the matter charged as libelous is true, and was published with good motives and for justifiable ends, the party shall be acquitted. The jury have the right to determine the law and the fact."

entitled " 'El Verde' team". This error was not committed. Ayuso Valdivieso, as defendant and in his capacity as editor of the codefendant Prensa Insular de Puerto Rico, Inc., frankly admitted, when he testified as a witness, that he had drafted the first of said articles and had ordered the preparation of the second one. For that sole reason the articles published were admissible in evidence. Moreover, said articles constituted the gist of the informations filed and were the best evidence of their content. They were therefore admissible on that ground also.

In assignments IV, IX, and X the defendants urge that the trial court committed manifest error in not holding that in accordance with the evidence the facts denounced as defamatory are true and were published with good motives and for justifiable ends; in weighing the evidence for the prosecution and for the defense; in finding the defendants guilty and in rendering judgment against them. These errors are directed to the weighing of the evidence by the lower court. Although it is true that the evidence showed that the articles published conform in part to the truth, it is no less true that said articles contain paragraphs or at least complete sentences which were entirely false regarding matters which appeared to be libelous. The evidence was quite voluminous and we shall not even attempt to make a summary thereof as a whole. We shall only make a brief recital thereof. Said evidence showed that on June 8, 1945 Luisa Esteves Solá granted Luis Sugrañes, by public deed, an option for 120 days to purchase a property consisting of 108.99 acres, for the price of $100,000; that 13 days later, Mrs. Esteves Solá sold the whole property to Luis Sugrañes, Orlando R. Méndez and María Mercedes Costa Coll de Pomar, who constituted, shortly thereafter, a partnership under the firm name Caguas Development Co.; that on September 13, 1945 the Caguas Development Company segregated 25 acres of said property to devote them to the subdivision "El Verde"; that prior to the constitution, by public deed, of

the aforesaid partnership, the latter filed, in the Planning Board, an application of Intent to Subdivide the said 25 acres and it stated in said application that it was the owner of said tract of land; that Orlando R. Méndez, Commissioner of the Interior of Puerto Rico, was a member of said partnership; that the plat which was attached to said Declaration had been drawn by Orlando R. Méndez; that the Treasurer of Puerto Rico, through the appraiser Francisco Medina Mora, and for the purposes of the levying of property taxes, assessed on January 28, 1946, the 25 acres which constituted the property "El Verde" at 25¢ per meter, and six days later the same appraiser valued said lands for condemnation by the People of Puerto Rico at the rate of $4.50 per square meter for parcel "A", and at $4.25 per square meter for parcel "B"; that said appraiser first assessed the lands as rural property at the rate of $1,000 per acre, since that was an internal rule of the Bureau of Property Taxes of the Department of Finance in cases of subdivisions; that the practice followed in said Department is to assess all subdivisions as rural properties until the first lots are sold, and upon said lots being conveyed, they are appraised by square meter, this being the reason why the said appraiser followed such practice in this case when assessing the plots for their acquisition through condemnation proceedings by the Department of Education; that the Attorney General, Enrique Campos del Toro, on June 10, 1946, returned to the Acting Commissioner of Education the draft of the deed of purchase to be executed by the Caguas Development Co. concerning parcel of land "B" and refused to approve the said draft because Commissioner Méndez was a partner of the vendor, Caguas Development Co., and therefore the provisions of § 203 of the Political Code were violated; that Villaronga became aware of that fact sometime later; that subsequently, two "Notices for Offer of Purchase Price" were sent by H. A. Martin, Acting Commissioner of Education, to the Caguas Development Co., urging the latter to sell to the People

of Puerto Rico the plots "A" and "B" of the subdivision "El Verde" for $23,800 and $8,220, respectively; that in the petition for condemnation it was alleged that the Caguas Development Co. had refused to accept the offer made, such fact being false; that such allegation was set forth in the petition because in the opinion of the Department of Justice, or, at least, in the opinion of Attorney Federico J. Pérez Almiroty, at that time head of the Land Division of said Department and one of the attorneys who signed the petition, the same was necessary since it was "the only manner in which the court could obtain the necessary jurisdiction to be able to acquire, through condemnation proceedings, those lands, to comply with the public purpose involved in the case, . . ."; that the petition for condemnation was filed in the District Court of Caguas, accompanied by a declaration of taking for the acquisition and delivery of the property, signed by Mariano Villaronga, and by a check for the sum of $32,020; that the two parcels of land involved in the complaint are adjacent to the lands occupied by the High School of Caguas and will be used to enlarge the school center of said city; that on the following day the court rendered judgment vesting the People of Puerto Rico with title to the two parcels of land described; and that on the day after judgment was rendered, the Caguas Development Co. consented to what was requested in the petition and asked that the check deposited in the office of the clerk be delivered to it.

The evidence likewise showed that the land originally acquired by the three persons who constituted the Caguas Development Co. was rural and that the plots acquired through the condemnation proceeding were urbanizing lands. The evidence also showed the reason for the marked difference in the two assessments and also that the lots adjacent to the lands, the object of the condemnation proceeding, had been sold shortly before the institution of the condemnation proceeding to private persons at $5, $4.75, and $4.50 per square meter.

The evidence did not show that the condemnation proceeding was availed of as a subterfuge;[6] that the transaction was illegal; that the area of the two parcels was 1½ acres (it being shown, on the contrary, that such area consisted of almost two acres, that is, 1.930 acres) ; that the price paid, according to the official appraisal made by the Treasurer through one of his appraisers, was almost 30 times greater than its value on July 7, 1945; that the condemnation proceeding was contrary to law merely because one of the partners of the firm to which the properties belonged was the Commissioner of the Interior of Puerto Rico; that the action of the Auditor of Puerto Rico in promptly ordering the payment of the sum of $32,020, necessary to be filed with the complaint in the condemnation proceeding, was contrary to law; or that there had been any corruption, confabulation, or conspiracy between Mariano Villaronga and the other officers of the government mentioned in the articles published, when they acquired the two parcels of land at the above-mentioned price, through condemnation proceedings.

Therefore, there was sufficient evidence in the record to justify the judgments rendered by the lower court and it has not been shown to us, on the other hand, that the latter committed manifest error or acted under the influence of prejudice, passion, or partiality. Consequently, no error was committed in holding that the facts charged as defamatory were false or in finding the defendants guilty of the offense of libel.

Since none of the errors assigned were committed by the lower court, the judgments appealed from must be affirmed.

Mr. Justice Negrón Fernández did not participate herein.

---

[6] By Act No. 115 of May 8, 1945 (Laws of 1945, p. 378), as amended by Act No. 256 of April 3, 1946 (Laws of 1946, p. 526), the Commissioner of Education is empowered to acquire, through purchase or condemnation proceedings, lands and lots for urban and rural public schools, library facilities, and second rural units.

MR. JUSTICE SNYDER, concurring.

The defendants published a charge that certain government officials, including the Commissioner of Education, were engaged in a criminal conspiracy to obtain for Caguas Development Co. an excessive price from the government for its land. The defendants failed to demonstrate that this charge was true. I therefore vote to affirm the judgment.

Nevertheless, I believe we should point out in a case of this nature that the defendants were entitled to publish the fact that the condemnation proceeding incorrectly alleged that it was brought because of a failure to agree on price, whereas it was really brought because the Political Code prohibited voluntary sale of the land.

In addition to the misstatement of the true reason for condemnation, the complaint, the motion of Caguas Development Co. accepting the deposit which the complaint alleges had been previously rejected, and the consent judgment were filed almost simultaneously. If the district court had been told it was entering a consent judgment in a case where the Political Code prohibited voluntary sale, it might have refused to sign a consent judgment and might have insisted on an open hearing with testimony and an adjudication as to value.

I am convinced that these facts, which on the surface seem suspicious, occurred not because of any criminal conspiracy or corruption, but because of the ineptitude of a subordinate of the Attorney General who was handling the condemnation proceeding. Nevertheless, since these unusual circumstances did exist, I would not vote to convict if the defendants had merely published them and a fair comment thereon. In going beyond them and making a charge of criminal conspiracy, for which there is no possible basis in the record, the defendants violated our criminal libel statute.